Thank you. If it pleases the Board, good morning. My name is Ethan Miller. I represent the Department of Health and Welfare. Help me on something that's bothering me here. When I used to do insurance defense and plaintiffs and coverage litigation from both sides, that kind of thing, whenever money would get paid, there would always be a reservation of rights letter, or else there would be an agreement preserving rights or waiving some rights and preserving others. Is there – where should I look in the excerpt? There is none, Your Honor. In some circumstances, that would take place. In this case, though, Your Honor, there was a court order. There was a summary judgment order. Wait a minute. You say court order. Are you talking the summary judgment? The order on summary judgment. Summary judgment. It's not a preliminary injunction. It's an adjudication about facts not at issue and the legal conclusion from them. That is true, Your Honor. However – Was there any court order in the nature of an interlocutory injunction saying – No, there was not, Your Honor. However, had it not been for the court's – for the motion on summary adjudication, had it not been for the court's order against us, we would never have paid the money. Okay. There's no reservation of rights letter and no release agreement. There's no release – there's no settlement agreement. Justice Nelson's decision in Slavin in which the court found that there was a waiver of the right to contest the order in the first place was founded on the fact that there was, in fact, a settlement agreement and, in fact, that the appellant had withdrawn its objections. I wasn't getting to the law yet. I'm just talking about the record. We can't see it. Can you see it, Ferdinand? Excuse me? I can't see it and I don't care to see it. None of us can see it. It's of no value to us. So if you move away from the podium and talk about it, all it will do is mess up the record. Okay. This is what we can see. Okay. Why don't you take it down so it doesn't distract us? Thank you. It's distracting. You have to take account of old eyes when you – I know. That's exactly why we gave the handout. We're real passionate on the 14-point type rule. Okay. So if I can finish up on Your Honor's concern about the payment in the first place. There is a court order. When you say court order, you mean the partial summary judgment. It wasn't summary judgment on the whole case. You mean the partial summary judgment. So the only document we have to look at to figure out what the effect of paying the money is, is the partial summary judgment. Yes, Your Honor. Okay. Because we're not for that. And now what is the case that says sending a check doesn't waive your rights to dispute whether you owe that money? I think it's the inverse, Your Honor. I don't think that there is a – there's no settlement. There's no – simply because you send a check doesn't mean you're waiving your rights. Now, Your Honor – Is there a case one way or the other that we can just follow? Not that I'm aware of, Your Honor. Now, we're not – And it looked to me like there's kind of a hole. And I hate to make California law if we don't have to. Your Honor, we are not seeking that money back in and of itself. We are simply seeking to challenge – Well, wait a minute. If you're not seeking that money back, do we have to decide about anything but the punitives? Your Honor, that – I don't – if you're not wanting that money back, I don't see why we have to fool with the pollution exclusion and the destruction by government order and the suspension of operations. Your Honor, we're not – the money is not our ultimate goal. We believe that the logical conclusion of the interpretation of this policy is, in fact, that the money ought to come back. That's not our ultimate goal here. Our ultimate goal is getting, Your Honor, to reexamine the order that found that the contaminant exclusion – Yeah, but why should we do that if it doesn't matter? It matters because of the $12 million in punitive damages because we're – Okay. You want to fight about anything but the punitives. You see, you've got three issues here, the pollution exclusion, the destruction by government order, and the suspension of operations. Correct. And my thinking is if you've already paid for all that stuff, even though you might not have been obligated to, then we don't have to decide whether you're obligated to. Your Honor, we do. I'm asking for the money back, and I can't see where you preserve your right. You want us to decide whether you breached the contract, correct? Yes. If we decided straight up you did not breach the contract, then everything else falls, right? Absolutely, Your Honor. And you get the money back, but you don't want it back. No, Your Honor. Is that true? We're not saying – I misspoke. It's not that we don't want the money back, Your Honor. It's that we believe that is a logical conclusion, yes, of the proposition that we did not breach the contract. Our goal is – our primary goal is that the contract is clear and explicit and that there never should have been any bad faith in this case. And if there's no bad faith, then there's no basis for the punitive damages. Oh, okay. So what you're saying is it's not really critical whether you get the money back, but there can't be punitives without a breach of the contract, bad faith, plus fraud and all that other stuff that California requires. And you're saying, number one, we didn't breach it at all. Yes. Number two, even if we didn't – even if we breached it, it wasn't bad faith. Absolutely. And number three, even if it was bad faith, it wasn't fraud and all that other stuff. Absolutely. Okay. Now I get it. Thank you, Your Honor. Now, if I could go quickly, I know you don't want to – you can't focus on this, but if I could ask you to focus on your handout. Northern believes that this exclusion is fundamentally different from the exclusion that was at issue in the Keggy case upon which the district court based its analysis and also on the McKinnon case, which is virtually identical. This exclusion has eight – first of all, this exclusion says that it applies to any contaminant. There is no limiting language in there whatsoever that says, well, it only applies to dead contaminants or it only applies to inorganic contaminants. But lest there be any question that this exclusion is fundamentally different. I don't get where spoilage is a contaminant exactly. Our bodies are completely covered with staphylococcus bacteria and all kinds of other bacteria that are deadly if you get an infection. Our bodies are covered with them. Babies are infected with them at the moment of birth. All fruits, all vegetables, everything that grows is covered with bacteria. And it's just a question of how far along they are before you eat the stuff. Right. In this case, Your Honor, this exclusion, when it talks about spoilage, it expressly accepts out from the exception spoilage because of lack of refrigeration. For food. This case involves food. It doesn't involve bacteria on the human body. In this case, if I can turn Your Honor's attention to Exception 8. Exception 8 at the bottom is the most crucial exception. Right here, it talks about spoilage and additional coverage. Our argument, Your Honors, is that that shows that this exclusion otherwise would have to apply to bacteria because spoilage is accepted only when it talks about failure of refrigeration. This is not a failure of refrigeration case. The spoilage of food because of failure of refrigeration almost always results in the propagation of bacteria. Bacteria is necessarily a part of this, as is peanuts, contamination by peanuts, or any other type of contaminant. The spoilage additional coverage section shows, because it arises as a result of bacteria, that the rest of this is fundamentally different from the McKinnon type situation, from the Keggy case. How do we know that also? This exclusion has, if I can direct Your Honor's attention to the second column, the out of farm land. It has all of this out of farm real property detoxified, de-neutralized. It says it four or five times. This denotes real property. This is a CGL. This is a liability section. This is a first-party property section. The two are completely and fundamentally different. You don't throw out contaminated land. You do throw out a contaminated first-party product. Mr. Fandis? It's an incredibly sophisticated argument, but the question really is, I'm Mr. A Towel of Foods, and I don't do insurance policies. I do food. And I look at this thing. Discharge, dispersals, seepage, migration, release or escape of pollutants. And I look down and say, well, I wonder what a pollutant is. Well, it's a solid, liquid, gaseous or thermal irritant or contaminant, blah, blah, blah. But I don't think stuff coming out of my food is called a pollutant. That's what he said. And he doesn't think, hmm. But then there's this number eight, spoilage, additional coverage section. I wonder if maybe that brings bacteria in. That's very sophisticated, but is that the approach we're supposed to take? Yes, Your Honor. We believe it is part of the reasonable expectation because otherwise what the court is doing is the court is disregarding this entire portion right here. It's saying this doesn't exist. And this is the lion's share of the exclusion. And you have to cross it out. And it's by far the vast majority of this exclusion. It's only this portion up here and the portion down here, the definition that one could infer across in terms of real property or CGL loss. Could you help me a little bit on the destruction by government order exclusion? Absolutely, Your Honor. On Canada's law, it looked to me as though you probably should destroy the food that is in or bound for Canadian consumers when you get one of those letters. Based on what the handbook says, assuming we take notice of it, which we have not decided yet. However, did the district court have that handbook in front of it? They didn't have the handbook, but that goes to interpretation of the contract, which we believe is a matter for the de novo consideration of this court. But perhaps more importantly, we believe that certainly the adjusters, when they looked at it, when a reasonable person looks at it and they say, this is a product recall. I thought that when people were talking about foreign law, there are all kinds of procedures for putting the foreign law before the trier of fact or the district court to tell the district court, here's what the foreign law is. Here's the statute. Here's the regulations. Here's what it is. And in the absence of doing that, you don't get to just come to the court of appeals and say, guess what, the district court didn't understand foreign law. We thought we had done so, and if we didn't do it appropriately, we apologize. Excuse me? We thought we had done so, Your Honor. If we didn't do it appropriately, we apologize. Well, I understand. It's not an apology question. The question is, how can I say the district court erred in not understanding this foreign law? Because the common understanding of a product recall, we believe, irrespective of the request for judicial notice, irrespective of the Canadian document. So what you're saying is that it would just be common sense for ITELA that if food is recalled, they know they're supposed to destroy it. That's exactly what this is. Not, oh, gee, this food has bad bacteria, make people sick. I guess we should sell it. Item 7 in the excerpt said, on ITELA's letterhead, it says, copy of the Canadian Food Inspection Report, which initiated the reason for the recall. There's no question that it was the Canadian Food Inspection, this is item 7 in the excerpts, initiated the reason for the recall. So to say that this is somehow not voluntary, this is somehow voluntary, then any product recall would be voluntary provided there's simply compliance with the order. I'm very low on time. If I could move on very quickly to the genuine dispute issue. The district court, once having made these errors in the interpretation of the policy, both the product recall and the business interruption and the contaminant exclusion as well, then said, I'm not going to make the determination of whether there is a legally tenable basis to do this. I've given Your Honors another handout, which is simply an excerpt from the record. It's page 158 of Appley's excerpt from the record. And what it shows, if I could read this, it shows a fundamental misunderstanding by the district court of the law of that, of the objective prong of the genuine dispute doctrine. Could you give us the, oh, I see. Do we have this in our excerpts of record? That is it. Do we have it in the excerpts of record? It is. It is on page 158 of Appley's excerpts of record. I just gave it to Your Honor for convenience. Okay. If I could turn your attention to line 10, if I could read this, please. The mere existence of a good-faith disagreement between the insurer and the insured over the interpretation of the policy does not in itself establish bad faith. That, the problem is that is exactly backwards. The mere existence of a good-faith interpretation, a good-faith disagreement over the interpretation of language establishes good faith. We believe that, in this case, the district court fundamentally misunderstood Klobara, Chateau-Chambray, Opsel, Brinderson, and all of the other cases. What you're going to hear, I believe, in a few minutes from opposing counsel is a melding of the objective and the subjective prong. It is the objective prong that Justice, that Judge Baird, that the district court here refused to consider. In numerous places, she said, I'm not going to consider the objective prong. I'm not going to make a determination of whether our reliance on this contaminant exclusion, of whether our reliance on the product recall was reasonable or not. And I posit to Your Honors that that's a determination that Your Honors can make now and that Your Honors should make now. Was this a reasonable, even if Your Honors disagreed with it? I didn't get that there was a challenge to the instruction in the issues presented on review. These were, these were, I'm sorry, on review, there is not an explicit challenge to the instructions, per se. There is a challenge to her failure to find a legally tenable, to even determine whether there was a legally tenable basis. And in the process of the jury instructions determination, she repeatedly refused. She called Chamburet and other decisions that require the objective prong a whineless. She didn't understand that these cases require the objective determination to be made in the first instance. She simply didn't do it. And so, yes, Your Honor, we do have, we have a challenge to the jury instructions to the extent that they reflect her refusal, for instance, on the summary adjudication motion. If I could turn, Your Honors, to the summary adjudication motion, which is in the first volume of the excerpts of record, what she did, what the district court did here was, at page 128 of our excerpts of record, and we challenged this up one side and down the other in our briefs with respect, Your Honor. What she did on page 128, she went right from a discussion of what the law is to discussing the investigation of the claim. You never get to the investigation of the claim unless you determine that there was not a reasonable interpretation in the first place of the policy language. On page 128, she goes, the paragraph beginning with the underlying facts concerning defendant's investigation are in dispute. But that's not, that's irrelevant unless you first determine that our reliance on the exclusions was not in and of itself at least reasonable, even if incorrect. That is Chateau-Chambray, it's Offsull, it's Brinderson, it's any number of other cases. That's our fundamental issue here, is that no one looked at this and said, is there a reasonable interpretation of this language? With that, Your Honor, I would like to reserve the balance of my time. Thank you, counsel. Good morning, Your Honors. May it please the Court? I'm Nat Byron. I was the trial lawyer on this. If you could set the time for three minutes, I'm only going to respond. Would counsel, would the clerk please start the clock at three minutes? Thank you very much. My sole response is going to be about the substantive area of the decision on the motion for summary judgment. Mr. Pine will respond to all the procedural issues and any other issues brought up before the Court. This is a simple question. It was at every level of this case. What does the pollution exclusion mean? What is the clear language? Counsel, I thought you were in great shape on the pollution exclusion. It struck me that you had a whole lot of trouble with coverage for suspension of operations, and you also had a problem with destruction by government order. I don't know what you're supposed to do if your food product is recalled except destroy it. I mean, sell it cheap? Really? Well, I mean, it's the good conduct of this company, save people from being injured like they have. I don't get why you don't have a good faith dispute about suspension of operations. Actually, it looks to me like they're probably right on suspension of operations. And I don't get why you don't have a good faith dispute on destruction by government order. Well, let me first start with suspension of operations. The suspension of operations issue at most raises a question over the amount of damages, because the conduct in denying the claim as to the property that was lost, which was a substantial portion of the claim alone, is a basis for the bad faith finding and a basis for the punitive damages. On the suspension of operations, what they the position that they took was that the listeria getting on the property was not something that required the suspension of operations, and there was no evidence to support that. The evidence was very clear from the- But they didn't suspend operations. Well, they suspended complete operations of that portion of their business. Sure, but that's only one portion of their business. They didn't suspend their operations. They just quit selling the seafood salad for a couple of weeks, but they continued selling the salsa and the eggplant parmesan, and the salsa was made in the same room. They have basically two lines of food, and they completely suspended one line that was affected by the listeria. And there's no cases- So why don't they have a good faith dispute? Is this the part that your other counsel was supposed to be addressing? Yes, it really is. Oh, is that right? Yes. You were just going to address the one issue, correct?  Okay. Go for it. Well, if the Court's not concerned with the punitive damages on the- Oh, no, no, no. It's interesting. $12 million is interesting. Okay. On the pollution exclusion, basically, it has to be interpreted, as Justice Baird pointed out, based on the Crane case, which is the California Supreme Court, on what layman would interpret it. You have a situation here. It has to be clear, plain, and ambiguous. You have a situation where their own people interpreted pollution exclusion as not being applicable. Not once, not twice, but three times, and under two separate portions of the policy. And you have a situation where, when they wanted to exclude bacteria, they knew exactly how to do it. They said in Section F of the policy, where they wanted to exclude bacteria, that they were- it included contaminants and bacteria and virus. Oh, so what you're saying is they knew from their own people the pollution exclusion is no good, but they continued to insist on it. Absolutely. Okay. Absolutely. Thank you. I see my time has run out. Thank you. Good morning, Your Honors. I'd like to begin first with the point that Judge Kleinfeld began with, which is whether or not we should even be looking at any of the various contract issues because of the settlement. And in particular, opposing counsel stated that here, unlike Slavin, he attempted to distinguish Slavin on the grounds that there was no settlement here. In fact, if you look at ER page 133, that's the final pretrial conference order, and there's two things that are striking about it. First of all, in paragraph K, it says, following the court's ruling, the parties agreed on an amount of benefits, $455,000, which were then paid, et cetera, and then plus interest, $505,000. So this is clearly the settlement. This reflects the settlement that the parties agreed, and elsewhere in the record, it makes clear that this is a compromise of disputed amounts because there was $200,000 in lost property claims and $435,000 in suspended business suspension damages. So there's like $635,000 in total, and they compromised on this. The other thing that is striking about this particular page of the pretrial conference order is that at the bottom, it says the stipulated net worth of $400,000,000 in this case, is a legal fiction and a compromise of legal and factual issues. This stipulation is valid for this case only and shall not be deemed in admission or used anywhere else. So they know very well how to reserve rights when they want to reserve rights. They did not reserve the rights here. This case falls flatly within the Slavin rule, and so any issue about whether there was a breach of contract on any of the three points they raised, I think, has to go out the window. And counsel is saying, well, we're leaving the money on the table, so let us argue it. The point is, when they didn't allow this item to go to judgment and become part of the judgment, when they paid it before that, this became collateral estoppel and res judicata on this issue. They don't get to let that happen and then come in after the fact and say, well, we were just kidding or whatever. I'd like to now turn to. Assuming it doesn't go out the window. Yes. In terms of the government action exclusion. Right. The letter from Canada looks an awful, smells an awful lot like it's the government's telling you you better get that stuff off the shelf. Now, if I don't look at the handbook and such, I may not know that. But how do we deal with that? The court said, well, that's not a government order telling you to drag it back. But, of course, I guess if we do look at the handbook, we know it smelled an awful lot like the government direction. Just the opposite, Your Honor. If we do get to the handbook, and, of course, they never, when they investigated this claim, they never thought boo about it. They never asked what that meant. They never wrote to Canada. They never did any of that. And it's very important. Why is that important? I'm thinking in the absence of somebody telling you a recall doesn't mean you have to destroy the stuff. Any normal person would think you better destroy the stuff. It's not a destruction question. It's a question of whether you were ordered to do it. Two different points here. It's two points. First of all, the Canada letter, I think a fraction of the product that was destroyed in this case was in Canada or in any way affected by the Canadian order. The vast majority was in the United States. Based on the Canadian order, this company, acting as a good citizen and out of concern for its customers, et cetera, voluntarily tested other batches, et cetera, and then when it found out the problem was endemic there as well, voluntarily destroyed those others. But the Canadian recall only affected a small fraction. Canadian recall, in quotes, only affected a small fraction. That's very important. Second of all, I think the Canadian letter, if you look at, if you do grant judicial notice and look at that document, the Canadian government distinguishes between voluntary recalls and mandatory recalls. In that language we quote in our brief. And if you don't do it voluntarily, they jump on you at both feet. Well, we don't know that that's the case. What we do know is that if they think it's something that merits mandatory recall, they have procedures to do so. And they didn't employ any of those procedures in this case. And furthermore, if you look again at what they thought and what they believed when they were adjusting this claim, their own document, their own investigator went to the plant and he wrote in the file voluntary recall. He didn't write mandatory recall, et cetera. All of this is after the fact rationalizations for what we're doing. I take that as what my father used to describe as army procedure. I want three volunteers, you, you, and you. I mean, you get a letter from the government that says your product, it says recall notice, and it says your product will make people sick. What else could it mean? The point is the policy says if you're ordered to do so. It doesn't say if you're advised by the government that it's a good idea. And, again, language like this is supposed to be interpreted in the way that against the insurance company, not in favor of the insurance company. They could have written it differently. They didn't. And so the question is, and they didn't even believe it themselves. Like I said, this was another one of the after thoughts. Help me on something else now. Yes, please. I mistakenly asked the question to your colleague, and I should have asked you, on the coverage for suspension of operations. I don't see where operations are suspended. It looks like they're just proceeding normally on salsa and eggplant parmesan. They're proceeding on those. However, the record shows, again, this is from the file that their investigator was either Brown or Dugo wrote, that the single largest product was the seafood salad. That's in the report that their investigator prepared. Now, if you look at the case they cited below to Judge Baird, the St. Paul case, that case draws a clear distinction and says it's either complete suspension of operations or partial suspension of operations. Likewise, if you look at the rudder group insert on insurance law, which they included. You've also got a direct physical loss or damage to property at the covered premises. Right. In this case, the equipment itself contained the infection, which is why they shut down the operations. That's what triggered the two-week shutdown of the plant, was that the equipment itself is reflected in the injustice report. Am I correct in thinking most of the money is actually the suspension of operations? No. It looked to me like there was a letter from ITELA that said you owe us $435,000, I think the figure was, for the suspension of operations. Let's address that. There's also a $200,000 figure, give or take, for destroyed products. So we had total claims of about $635,000. Of those claims, the defendants, because they wanted to be able to argue good faith to the jury, said I'll tell you what, we'll give you $455,000 and let's call it a day. So that's what they did. And it's impossible to back out from those numbers what portion of the $455,000 was for the $200,000 property coverage versus what part was for the $435,000 suspended operations. Now, they're the ones that made it impossible to fish that out. They're the ones that said we'll pay this. We'll compromise this claim. We won't let it go to judgment. We won't appeal it. And then after they do all that and they argue these facts to the jury, now suddenly they want to sit here and have you back out these numbers and attribute all of them to one claim and just ignore the other claim altogether. Isn't it true that if they have a good faith dispute on the business interruption, suspension of operations and also on the government recall, that that's enough for them to avoid bad faith, let alone malice and fraud? I don't think so at all, Your Honor. I think that the entire genuine dispute doctrine is that. It's a genuine dispute. Good faith dispute. It's not an after the fact. You hear lawyers every day. You know that a lawyer is capable of arguing either side of any subject under the sun. Sure, but why didn't they have a good faith dispute on those things at the time? They didn't believe these. Well, let's look at these. They didn't believe these things themselves. They wrote their denial letter, their January 5th denial letter, didn't say a word about most of the things they're now relying on. They both based that letter on this attempt to, in Judge Baird's words, attempt to con us into believing that we were not entitled to anything except for the 50,000 product recall expense, that everything was covered under that 50,000 liability. So that's what they were just trying to con us. These other things came after the fact. If we had just gone away, if we had taken the January 5th letter and said, oh, well, we tried and I guess we lose because of that 50,000 liability, these people never even would have thought about pollution exclusion. They never would have thought about government recall. All these things come in after the fact. That's point one. Point two is their claims file. Point two is the point I think that was made earlier. They paid under the very pollution exclusion language that exists, that same language exists on the product recall. They paid two checks on product recall expense. They paid two checks under that coverage and another check for 3,000 under another coverage that had the identical language. They never for a minute thought that pollution exclusion had anything to do with this case until our broker came in and exploded their con game and said, here, we have your January 5th letter. You're crazy. You're wrong. You're reading this wrong. This doesn't cover property, et cetera. And once they realized and their files show that they had this desire not to pay the $600,000 claim, that this is a big claim, and they kept on saying, how are we not going to pay this claim? And then we come back and say, well, the way you tried to con us didn't work, and so we have this other one. So I think the answer is it has to be a legitimate, genuine dispute at the time. It has to be what they believed at the time. They're allowed to make mistakes. That's the purpose of the doctrine. So they can make good faith mistakes. In all the cases, Chateau, Chamburey, and Guevara, in all these cases, read the cases, they all use the past tense. They all talk about the insurance company believed. When the decision was made, the insurance company believed. And there's a ---- Is there a California authority directly in point on whether the good faith dispute has to be expressed at the time? I believe there's a ---- I think the language, the language of the ---- I know that they use the past tense, but that's not a holding. Okay. I want to know if there's a holding where somebody argued, no, it's okay if it's after the fact. Somebody else said, no, it's not okay if it's after the fact, and they held one way or the other. I don't have it at my fingertips, but let me point you to other California authority, which I think is even more important. Well, they say the reasonableness of their decision must be evaluated at the time they were made. Thank you. Correct? I appreciate that. But let me point you to a bigger picture question. This is the seminal California ---- That's a little different. One can be a question of whether in light of all that they knew at the time it was reasonable to say we don't have coverage. The other can be a question of whether they had smart enough lawyers and adjusters to write coherent, intelligent letters. In other words, their investigation could show that at the time they denied coverage, they had a good faith reason to do so. And the file could also show that they wrote an incoherent, poorly expressed letter that did not set forth that good faith reason. We're not relying on the poorly written incoherence of the letter. We're relying on the entire ---- the entirety of what they believe based on the investigation file, based on Judge Baird heard the witnesses, the jury heard the witnesses. We went through this. We're basically ---- you're asking us to basically ---- Well, they knew at the time that the company was still selling eggplant, Parmesan and salsa. And salsa from the very same room. And they ---- They did not know that at the time. And the insurance company also knew at the time that there had been a California or rather a Canada recall. They did not know that at the time, Your Honor. There was nothing in the letter. The file shows that what they ---- The letter doesn't say. No, no, the file, the file, the investigation file. What it says is they suspended the operations. The stuff there you just quoted is taken from the trial testimony of Sam Galletti. It had that nowhere in the file is there one word that talks about they suspended this, but they didn't suspend this. They never looked at any of this. What you have just quoted comes from trial testimony well after all the events in question occurred. Another important point that I forgot to make before with regard to the suspension, the business suspension, even if we assume for a second that you're right on this and I disagree for the reason set forth in the case that says partial is enough and in our case we're talking about the single biggest part of our business. What percentage? What percentage? Give me an idea. Over 50? I don't know. The record doesn't show that, but the record does show that the seafood salad production was the single largest part of the company's business. But even for a second if we assume that that's correct, what we have here is that would not be grounds to deny the entire claim. At most, that would be grounds to dispute how much they had to pay. That certainly wouldn't give them grounds to deny the 200,000 for property destruction. So there's still bad faith. We're now quibbling over price, so to speak. And I think that's a critical distinction to bear in mind with regard to all this. Now, you asked about California authority. I would like to talk about Neal and then I have to talk about Campbell. Neal, California Supreme Court, pointed out that in that case some of the evidence showed that farmers did no more here than assert its legal position reasonably and in good faith. However, because other evidence in the record would have supported a finding of bad faith, the Supreme Court affirmed the bad faith finding and the punitive damages award in that case. Likewise, Tomaselli, which is the case that they trumpeted their entire thing on, if you look at the holding in Tomaselli, it points out that parts of the record show there's mere negligence going on, et cetera. Nonetheless, on bottom, the court affirmed the judgment there as well. So I'd like to talk about Campbell because I'm sure that's hot on everybody's mind. And I only have two minutes left. With regard to Campbell, there's a few things. First of all, I have to begin with the observation that the language in question is dictative because the court obviously could have overturned it based on the fact that so much of the case revolved around non-Utah activities. But let's take the dictative face value and deal with it. There's two critical things about Campbell. First of all, we may not even have to reach him. I don't think we should in this case because there's an alternate consideration. Campbell reaffirms TXO, which says in five different places, you don't just look at the actual harm. You look at the potential harm. And in TXO, there was potential harm that ran into between $1 million and $8 million. And the Supreme Court, in affirming the 526-to-1 ratio, said given the potential harm that could have occurred, ratio is irrelevant in this case. In our case, likewise, what we have is $900,000 in out-of-pocket losses. But we also have the fact that the insurer knew at the time that it denied the claim that there was a letter written a expeditiously, we're going to have trouble continuing our operation. So they knew that the potential harm in our case was that Itella could go out of business, which obviously would have run into the millions of dollars. Once you factor in the... Not obvious to me. I have no idea. Is that shown in the record? What's shown in the record is that they lost $425,000 for suspension of operations for two weeks. And I believe the record also shows that. Sometimes going out of business saves the stockholder's money because a business is losing money every year and it's just doing business to support the officers and directors and employees. I don't know. I have no idea. The second factor that's critical is that in Campbell, they made a very big point about saying that when there are large compensatory damage, general damages, emotional distress, these are usually used as partially punitive to do the purposes of punitive damages, et cetera. And therefore, in cases where there's large emotional distress, that's where they talked about the one-to-one ratio, et cetera. However, in our case, through a fluke, it so happened that our company was incorporated rather than just a partnership. And therefore, we were not able to seek, and they got the windfall benefit of the fact that there were zero emotional distress damages in this case, although for this kind of conduct, although obviously this caused tremendous distress to the family, and for this type of conduct, they should have been on the hook for like seven-figure emotional distress damages as well. So our case is very different. In our case, we're talking about just hard numbers. Counsel, I realize you're out of time, but I've got a question I want you to answer. I would love to. I hope. Well, under California Code 3294, to get the punitives, you need clear and convincing evidence of oppression, fraud, or malice. Right. And you need either ñ if fraud is involved, you don't need despicable conduct. But if fraud is not involved, you do need despicable conduct. And California has carefully said that's worse than bad faith. If bad faith isn't enough, you don't get punitive damages just because there's a bad faith denial of coverage. Tell me exactly what to look at that's your clear and convincing evidence of oppression, fraud, or malice. Well, I think that's what Judge Baird looked at in affirming the judgment. Yeah, but we can't take Judge Baird's legal decision as authority. No, no, I'm just saying, but she pointed ñ among the things she pointed to were the fact that they engaged in this deliberate effort to con ñ that's her word, not mine ñ to con ITELA by writing these phony excuses that they thought would make them go away. She also pointed out, and I think you're bound ñ unless her findings are clearly erroneous, you're bound under this ñ the Embank decision in Lambert and also under Cooper Industries to review these only for an abuse of discretion. She also found that the insurer, when they did this, was well aware of the fact that ITELA was in a precarious financial position because of ñ or vulnerable position because of what was going on and that if they didn't do this, there was a danger that they would be forced out of business. And if you read the standard California bad faith punitive damages cases, they're all similar. They're cases in which the carrier knows that the person needs the money, that they're entitled to it, and the carrier comes up with ways to refuse or to avoid or to delay paying, et cetera. Thank you, counsel. Thank you very much. Much of what you've just heard has been in the subjective realm of the objective of the Genuine Dispute Doctrine. You only get there, once again, if you don't have an at least legally tenable, a reasonable basis. And there is no waiver of that ñ of the right to rely upon those defenses simply because they are not raised in the very first response that an insurer gives. That's the Opsel case and that's the Waller case. If there's no waiver absent clear and convincing evidence to the contrary for coverage purposes, if there's no waiver of a defense, if there's no waiver of the business interruption or the contaminant or the product recall for breach of contract, there can be no waiver for purposes of the Genuine Dispute Doctrine. The second point I'd like to make, Your Honors, is that in the McKinnon case, the McKinnon case found that there were two camps as to whether an even narrower exclusion applied to traditional environmental contamination. Two camps, and the Court analyzed one of these camps all over the country that found that an even narrower exclusion than we have, the McKinnon at-or-from exclusion, in fact, does apply to things other than traditional environmental contamination. We would submit, Your Honor, we understand Your Honor's proclivity with respect to Exclusion G, but at a bare minimum, at a bare minimum, was it unreasonable to rely on this when, for instance, the Lynshore case out of Wisconsin did the exact same thing? We don't pretend for a moment that that's binding here, but that case should at least be further evidence of the reasonableness of the interpretation that we adopted. Second, the dictionary definition that we provided, Your Honor, I would refer Your Honor to our request for judicial notice, the first one. One of the dictionary definitions of contaminant is tainted food. So to ask Your Honor, is it reasonable for ITELA to read this and conclude that tainted food would in fact be excluded? We say absolutely yes, particularly when it has the spoilage in there as well. The mere fact that we're debating these issues right now shows we believe that there is, there has to be fundamentally a genuine issue, a reasonable dispute on all of this. It doesn't have to be based on law that then existed. That's the Morris case. It has to be based on a reasonable interpretation. Your Honor's decision in Guevara points that out. Your Honor's decision in Guevara also points out that once there is a genuine dispute in the law, not in the investigation, but in the law, the investigation ceases. Justice Nelson cited the Krieger case, the Brinderson case, the Francesci case, the Hansen case, the Lunsford case, all of these cases for that proposition. And I would finally conclude that even if you get to the subjective problem, there is no subjective bad faith here. We paid the $50,000 limit under the product recall. The exclusion in the product recall is different. That exclusion is different from the one that we relied upon in the first party section. It's a different exclusion. We paid the $50,000 limits. Hytella asserts that that is the con. Is it a con to pay too much money? Is it a con to give the insured the benefit of the doubt? In this case, perhaps we shouldn't have paid that money, if that's the net result. And then finally, to suggest that the January 5 letter was the end of the story is simply wrong. That completely ignores that on January 4, the broker knew that we were continuing to investigate the claim. The broker knew this. The business interruption, they didn't even provide the invoices for the business interruption until January 16. And then they say you can't, you have to ignore the January 29 letter. That's contrary to Wallace. Contrary to Opsal. There was no intent to waive. We're talking about a two-month window here, not two years. This issue, this claim was resolved really a month after it was substantiated, a month and a half. They didn't first substantiate the business interruption until December 15. They didn't provide the invoices until January 16. We worked over the holidays, over New Year's and Christmas, after the January, after the December 16 submittal. We worked like crazy under pressure, as the record reflects, from Mr. Breyer. Please read the Mr. Breyer trial testimony. He pressured our adjuster, because this was a very important matter, to a young producer in his office. Mr. Breyer pressured our underwriter, Ms. Stark, to come up with a determination in two weeks between December 16 and January 2. On January 4, Ms. Stark, in fact, before January 4, Ms. Stark has these conversations with Italo's broker and says, we're going to get you something, but understand it's preliminary. It is going to be preliminary. It's in our excerpts of record. It will be preliminary. It's not the final say on this. And so we finally issued the, we look at it, we get the additional support on January 16, and that's also in the excerpts of record that they just sent out on January 16. This is not two years. It's not a year. It's not eight months. It's a two-month period when we made this. And we originally made the first product recall expense on November 26, just a month after the claim was submitted on October 17, to assert that the con was created in the space between December 17, when the recall started, and November 26 is a month. Was this con created within all of Northern in the space of that amount of time? It doesn't pass the smell test. Thank you, counsel. Italo Foods versus Northern, insurance is submitted. We are recessed until 9 a.m. Thank you.
judges: Dw Nelson, Fernandez, Kleinfeld